UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
: 04 CV 2569 (ARR)(JMA)
SHEILA FRATICELLI, :
: NOT FOR
Plaintiff, : PUBLICATION
:
-against- : OPINION AND ORDER
:
JO ANNE B. BARNHART, :
Commissioner of Social Security :
:
Defendant. :
:
------------------------------------------------------------------- X

ROSS, United States District Judge:

Plaintiff Sheila Fraticelli brought this action pursuant to 42 U.S.C. §§ 405(g) to review defendant Social Security Commissioner Barnhart's adoption of the decision of the Administrative Law Judge ("ALJ") denying her request for Social Security disability insurance ("DI") benefits. Defendant has moved for judgment on the pleadings pursuant to Rule 12(c). Plaintiff has cross-moved for judgment on the pleadings. For the reasons stated below, the court denies defendant's motion for judgment on the pleadings, grants plaintiff's cross-motion, reverses the Commissioner's decision, and remands the case for further proceedings.

## BACKGROUND

1. Procedural History

Plaintiff Fraticelli applied for DI benefits on August 6, 2001, alleging an inability to work, beginning February 1, 2001, due to nervous depression. R. 94, 106.[1] The application was denied, R. 67, and plaintiff requested and was granted a hearing before an ALJ. R. 68-69,

---

[1] "R." refers to the administrative record filed with the court by defendant Commissioner.

1

21-62. The hearing, at which plaintiff appeared pro se, took place before ALJ Jane Polisar on January 21, 2004. R. 21-62 By decision dated February 12, 2004, the ALJ found that plaintiff was not disabled and was able to perform her past relevant work as a secretary. R. 11-20. The Appeals Council denied her request for review on June 10, 2004, making the ALJ's February 12, 2004 decision the final decision of the Commissioner. R. 5-6. The instant action was timely commenced.

2. Non-Medical Evidence

Plaintiff was born on September 26, 1960, and moved to Puerto Rico at age ten. R. 94. She completed high school and attended four years of college, R. 53, 144, 240. Plaintiff moved back to the mainland United States at age twenty and lived in Florida. R. 240. She moved back in Puerto Rico in 1994, R. 32, and finally to New York in February 2001, R. 37-38.

Plaintiff stated that she worked as a legal secretary from 1984 through 1991. R. 31, 144. As a secretary, plaintiff stated that she did different types of office work, including typing. R. 122. Plaintiff left that job when she moved to Florida. R. 31. From 1991 through 1994, plaintiff was employed as an assistant manager of a Target store. R. 31, 155. Plaintiff left that job because she divorced and returned to Puerto Rico. R. 33. From September through December 1996, and from September through November 1998, plaintiff worked for the Federal Emergency Management Agency ("FEMA"), doing paperwork and making photocopies. R. 34, 121. She sat for most of the day and did not do any significant lifting. R. 34. Plaintiff also worked from January to February 2001, doing secretarial work at the mayor's office in Puerto Rico. R. 35, 36-37, 107, 126.

Plaintiff stated that she was unable to work due to depression, nervousness, crying episodes, and inability to be around people.  R. 43, 47, 106, 119.  At the hearing held on January 21, 2004, plaintiff stated she was upset because her former husband took her children away from her.  R. 55.  She stated that she took Zoloft and Ambien, which helped her to sleep but which did not help relieve her depression.  R. 44.  Plaintiff stated that she sat all day and stayed at home because she did not want to talk to people.  R. 50-51.  She performed chores in her apartment, including sweeping, mopping, laundry, cleaning, and cooking.  R. 40, 52-53.

Plaintiff also testified that she had several physical conditions that prevented her from working.  She stated that she was unable to see well due to her diabetes, R. 47, that she had painful lumps on her hands, R. 48-49, and that her breasts were painful, R. 50.  Plaintiff took oral medication for diabetes.  R. 48.

3.   Medical Evidence

   A.   *Evidence Concerning Depression*

On June 25, 1999, about two years before plaintiff applied for benefits, Dr. Rafael Lacomba reported that plaintiff had a diagnosis of major depression on Axis I, deferred diagnosis on Axis II, no diagnosis on Axis III, and no psychosocial stressors on Axis IV.  He reported a global assessment function score (GAF) of 80 on Axis V.[2]  R. 170.  Plaintiff was on Effexor and Tranxene, with side effects of restlessness, nausea, and somnolence.  R. 170, 171.  Her prognosis was good with continued treatment.  R. 170.  Dr. Lacomba stated that plaintiff

---

[2]The GAF scale, a scale from 0 to 100, may be used to report the clinician's judgment of the individual's overall level of functioning.  A score of 80 indicates symptoms, if present, are transient and expectable reactions to psychosocial stressors and no more than slight impairment on functioning.

had no occupational or academic restrictions.  Id.  Dr. Lacomba continued treatment of plaintiff through May 17, 2000.

On August 31, 2001, Dr. Joshua Algaze conducted a consultative psychiatric examination in connection with plaintiff's application for DI benefits.  R. 138-39.  Plaintiff arrived at the interview alone by public transportation.  R. 138.  Plaintiff stated that she had been depressed since her divorce in 1994, and stated that she had a history of four psychiatric hospitalizations, the first of which was in 1997.  Plaintiff explained that she lived with a friend and did nothing all day, although she was capable of doing some chores and watched television occasionally.  Id.  She reported being withdrawn and isolated.  Id.

After a mental status examination, Dr. Algaze diagnosed plaintiff with major depression on Axis I, personality disorder not otherwise specified in Axis II, and hypertension on Axis III.  R. 139.  He opined that plaintiff suffered from moderate difficulties in personal, social, and occupational adjustment that impair her ability to tolerate work pressures, and encouraged the plaintiff to continue psychiatric therapy.  Id.  He reported her prognosis as guarded.  Id.

On October 17, 2001, Roman-David Trajanowski, a certified social worker, interviewed plaintiff in her home in connection with her application.  R. 140-44.  Plaintiff reported that on a typical day, she woke up between 7:00 and 8:00am, made breakfast, watched television, cleaned, read, and visited with a friend.  R. 140, 143.  She made dinner for herself, ate around 5:00pm, and went to bed at 9:00pm.  R. 140.  Plaintiff lived with a friend, who allowed her to stay rent-free.  R. 141.  Mr. Trojanowski observed that the apartment was neat, clean, and well-maintained.  Id.

Mr. Trojanowski observed that plaintiff's appearance and hygiene were good, and that she wore jewelry and make-up. Id. Plaintiff denied suicidal or homicidal ideation, and also denied auditory or visual hallucinations. R. 142. Plaintiff stated that she was depressed in part because she had been told that a mammogram showed findings that required further study. R. 141-42. Plaintiff reported that she was preoccupied, worried, angry, and had difficulty sleeping. R. 142. Plaintiff cried when talking about her divorce and her estranged children. R. 143.

In October 2001, plaintiff commenced treatment for depression at Brookdale Hospital. At her initial intake interview at Brookdale with social worker Marie Thomas, plaintiff was tearful as she explained that she had a recent abnormal mammogram. R. 224. She reported that her husband left her for another woman, and that her brother and father had passed away in April 2000, and August 2000, respectively. Id. After a mental status examination, Ms. Thomas assessed recurrent, moderate, major depression on Axis I, deferred diagnosis on Axis II, status post hysterectomy on Axis III, divorce and separation from children on Axis IV. R. 233. Plaintiff started counseling with Ms. Thomas on November 9, 2001. R. 281.

On November 13, 2001, plaintiff saw Dr. Espiridon Elio for pharmacological evaluation. Dr. Elio diagnosed moderate recurrent major depressive disorder on Axis I, deferred diagnosis on Axis II, status post cholestectomy on Axis III, unspecified stressors on Axis IV, and GAF of 75 on Axis V.[3] Dr. Elio indicated that his diagnosis was based on

---

[3] A score of 75 indicates symptoms, if present, are transient and expectable reactions to psychosocial stressors, and no more than slight impairment of functioning.

plaintiff's depressed and anxious mood, tearfulness, poor sleep, and social withdrawal. Dr. Elio recommended pharmacological treatment consisting of Paxil and Sonata. R. 245.

At a follow-up visit on November 21, 2001, plaintiff reported that she felt better with Sonata, although she remained anxious about her mammogram results. R. 280. Dr. Elio reported that plaintiff appeared more composed than on her prior visit, and that she was not psychotic, suicidal, or homicidal. Id.

On November 23, 2001, State agency medical consultant G. Peters, Ph.D., reviewed the record and concluded that plaintiff suffered from major depression. R. 149. He assessed that plaintiff had moderate difficulties in maintaining concentration, persistence, and pace. He completed a Mental Residual Functional Capacity Assessment, on which he indicated that plaintiff was moderately limited in: (1) her ability to carry out detailed instructions, R. 160; (2) her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, R. 161; (3) her ability to respond to changes in the work setting, id.; and (4) her ability to set realistic goals or make plans independently of others, id. Based on the report of the consultative examination of August 30, 2001, Dr. Peters concluded that although plaintiff had depressive symptoms, they would not prevent her from performing work-related mental activities. R. 164. Further, Dr. Peters concluded that plaintiff could "understand, remember, and carry out instructions," and had adequate concentration. Id. He also noted that plaintiff was "[a]ble to relate appropriately to co-workers and supervisors . . . and adapt to changes in [the] work setting." Id.

6

At a December 7, 2001 counseling session with Ms. Smith, plaintiff stated again that she was lonely and missed her children. R. 281. She stated that she was taking her medications as prescribed and that they were helping. Id. On December 11, she told Dr. Elio that she suffered no side effects from her medication. R. 280. During her counseling session on December 20, 2001, plaintiff was tearful as she discussed her longing for her children. R. 280.

Dr. Elio renewed plaintiff's Paxil and Sonata prescriptions on January 11, 2002, at which time plaintiff told him that she had been increasingly agitated and anxious and was too afraid to travel to visit her ailing grandmother in the Bronx. R. 279. Plaintiff was not suicidal or homicidal, and still had no side effects from her medication. Id.

At a counseling session on January 29, 2002, plaintiff told Ms. Smith that she hoped to be declared eligible for SSI so that she could use the money to search for her children. R. 278-79. At multiple counseling sessions and meetings with Dr. Elio between January and April, 2002, plaintiff reported taking her medication as prescribed, reported no side effects, and denied suicidal and homicidal ideation. She repeatedly reported sadness about missing her children. On March 4, 2002 plaintiff discussed her boyfriend's criticism. R. 277.

On April 1, 2002, plaintiff reported erratic sleep, even with Sonata. Id. She stated that she had not been feeling well, possibly because she had discontinued Paxil. Id. She denied any side effects from the medication. Id. Dr. Elio again prescribed Paxil and Sonata. Id. Plaintiff's condition remained unchanged between April and November 2002. See R. 271-72. During this time plaintiff was compliant with her medication and reported no side effects. She remained sad about her children. Id. At a meeting on November 26, 2002, Dr. Elio noted that

7

plaintiff had been consistently stable and had no complaints other than occasional sleep interruptions. R. 269. Plaintiff was excited about an upcoming trip to Puerto Rico. Id. Plaintiff's condition remained stable through March 2003.

In a treatment plan dated March 25, 2003, Ms. Thomas reported that plaintiff had made substantial progress toward her treatment goals. R. 252. Plaintiff was compliant with treatment. Plaintiff "reported the absence of suicidal ideation and depressed mood." Id.

Dr. Elio continued to renew plaintiff's Paxil and Sonata prescriptions during April through July 2003. On April 16, 2003, Dr. Elio stated that even though plaintiff had not taken her medications for one month, there was no overt decomposition. R. 268. On May 20, 2003, plaintiff denied depressive symptoms. R. 267. On June 25, 2003, Ms. Thomas indicated in a treatment plan review that plaintiff's depressive symptoms were in remission with Paxil and Sonata. R. 250.

In August 2003, plaintiff started treatment with a new social worker and physician. On August 11, 2003, she saw her new counselor and was tearful when talking about her children. R. 312. Plaintiff met her new physician, Dr. Emad Bishai-Tewfik, on August 13, 2003. R. 310. Plaintiff told Dr. Bishai-Tewfik that she had gained a lot of weight on Paxil and did not sleep well on Sonata. Dr. Bishai-Tewfik diagnosed major depressive disorder on Axis I, deferred diagnosis on Axis II, hypertension, diabetes, and fatty liver on Axis III, family conflicts on Axis IV, and GAF of 50 on Axis V.[4] Dr. Bishai-Tewfik discontinued Paxil and

---

[4]A score of 50 on the GAF scale indicates serious mental symptoms or serious impairment in social or occupational functioning.

Sonata, and started Zoloft and Trazadone.  Id.  Plaintiff canceled her appointments on August 28 and October 1, 2003.  R. 308.

On January 14, 2004, Dr. Bishai-Tewfik reported that plaintiff was being treated at Brookdale with psychotropic medications.  He stated that plaintiff's depression varied from session to session, that she had insomnia, and was dealing with much stress related to her ex-husband and children.  R. 296.

B.      *Evidence Concerning Plaintiff's Physical Problems*

Plaintiff has suffered numerous physical problems during the period at issue.  Plaintiff went to Brookdale on January 3, 2002, with complaints of constipation and stomach pains associated with eating and hunger.  R. 215-20.  She also reported a recent abnormal mammogram.  She gave a medical history of cholestectomy, hysterectomy, cancer of the uterus, and depression.  In January and February 2002, plaintiff was treated for chlamydia.  R. 201-02, 211-14.  On February 4, 2002, plaintiff was seen for a nutritional assessment, at which time the doctor ordered liver function tests, monitoring of the plaintiff's blood pressure, and diet to control high cholesterol.  R. 208-09.

On February 19, 2002, Dr. Lebovitch assessed atypical chest pain and started Celebrex.  R. 203.  On March 21, 2002, Dr. Lebovitch noted laboratory results, including a January ultrasound finding of enlarged fatty liver.  R. 198.  Plaintiff complained of persistent pain in her abdomen and constipation.  R. 198-99.

On April 25, 2002, Dr. Lebovitch saw plaintiff for a follow up.  Plaintiff had a ringworm type infection on her neck.  She had tenderness in the right upper quadrant epigastric area.  She was taking Pepcid and Prevarid.  She stated that her fasting blood sugar was 168.

9

Dr. Lebovitch assessed diabetes, possible peptic ulcer disease, and ringworm. He started Glucophage and Accupril, Pepcid and Mentax cream. R. 380.

In May 2002, plaintiff was treated for herpes. R. 194-95. Dr. Lebovitch saw plaintiff on July 8, 2002, R. 193, at which time plaintiff's problems were rule out gastroesophageal reflux disease, osteoarthritis, complaints of headaches, and polyuria. R. 193.

Dr. Lebovitch saw plaintiff again on August 19, 2002, at which time plaintiff complained of left toe pain extending to her ankle. R. 189. Dr. Lebovitch assessed hypertension and increased her medication due to a high blood pressure reading of 166/86. Id. For diabetes, Dr. Lebovitch recommended an 1800 calorie diet. For left toe pain, he advised warm socks and nonsteroidal anti-inflammatories and consultation with a podiatrist. Id. On September 3, 2002, Dr. Lebovitch again assessed hypertension and diabetes. R. 186. On October 29, 2002, plaintiff had complaints of abdomen pain. R. 185. Dr. Lebovitch assessed hypertension, gastroesophageal reflux disease, and diabetes.

On December 2, 2002, Dr. Lebovitch reported that plaintiff was under his care in the Brookdale Family Care Center. R. 172. He reported that plaintiff had a history of diabetes and needed to take her glucose machine with her when she traveled so that she could test her blood sugar level two times daily. R. 172. On February 18, 2003, Dr. Lebovitch continued Glucophage for diabetes and prescribed Spectazole cream for vaginal candidiasis. R. 184. On July 21, 2003, bone density studies revealed low bone density consistent with osteopenia. R. 362. It was recommended that plaintiff start moderate weight-bearing exercises. Id.

On August 25, 2003, Dr. Lebovitch again assessed diabetes. In September 2005, plaintiff was seen by Dr. Spyropoulos in the podiatry clinic, who assessed bursitis in plaintiff's

10

left toe, treating with an injection of Lidocaine solution and prescribing Neurontin. Plaintiff returned two weeks later complaining of swelling in her left foot and lower leg, and numbness and a feeling of heaviness in her legs. R. 356. Plaintiff denied any trauma. Dr. Spyropoulos assessed diabetes with peripheral neuropathy and venous insufficiency. Id. He ordered a Doppler study. Id.

On September 18, 2003, plaintiff was seen for acute vesculitis. R. 355. On December 2, 2003, plaintiff complained of right shoulder and arm pain and periodic headaches with dizziness. R. 354. Dr. Lebovitch diagnosed diabetes and osteoarthritis. R. 354. Dr. Lebovitch continued Glucophage for diabetes on January 5, 2004. R. 352.

    C. *Evidence Submitted to the Appeals Council*

After the ALJ issued an unfavorable decision on her claim, plaintiff submitted supplementary evidence to the Appeals Council, namely letters from Dr. Lebovitch and Dr. Bishai-Tewfik stating that plaintiff was unable to work. First, on March 2, 2004, several weeks after the ALJ's February 12, 2004 decision, Dr. Lebovitch reported that plaintiff was under his care for hypertension, osteoarthritis, and diabetes. R. 166. He stated that due to her illness, plaintiff was "temporarily unemployable." Id. On March 4, 2004, Dr. Bishai-Tewfik reported that plaintiff, a clinic patient for two and a half years, was suffering from depression and was being treated with medication and weekly psychotherapy. R. 165. He stated that plaintiff was "not able to work." Id.

**DISCUSSION**

1.      Standard of Review

This case comes to the court for review of the Commissioner's decision that the plaintiff is not disabled.

> Under the Social Security Act, a "disability" is defined as inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1). An individual is considered to be under a "disability" if his impairment is of such severity that he is unable to perform his previous work and, given his age, education, and work experience he is not able to engage in any other type of substantial gainful employment in the national economy. See 42 U.S.C. § 423(d)(2)(A). In determining whether an individual is disabled, the Commissioner is to consider both objective and subjective factors, including "objective medical facts, diagnoses or medical opinions based on such facts, subjective evidence of pain and disability testified to by the claimant or other witnesses, and the claimant's educational background, age, and work experience." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980)(citations omitted).

In order to establish disability under the Act, a claimant must prove that (1) he is unable to engage in substantial gainful activity by reason of a physical or mental impairment expected to result in death or that had lasted or could be expected to last for a continuous period of at least twelve months; and (2) the existence of such impairment was demonstrated by medically acceptable clinical and laboratory techniques. 42 U.S.C. §§ 423(d), 1382(a); see also Shin v. Apfel, 1998 WL 788780 at *5 (S.D.N.Y. November 12, 1998) (citing cases).

The SSA has promulgated a five step process for evaluating disability claims. See 20 C.F.R. § 404.1520.[5] The Second Circuit has characterized this procedure as follows:

> "First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful employment. If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)) (brackets and alteration in original). The plaintiff has the burden of establishing disability on the first four steps of this analysis. On the fifth step, however, the burden shifts to the Commissioner. See Blueband v. Heckler, 730 F.2d 886, 891 (2d Cir. 1984).

The court's role in reviewing the decisions of the Social Security Administration ("SSA") is narrowly confined to assessing whether the Commissioner applied the correct legal standards in making his determination and whether that determination is supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); Donato v. Secretary, 721 F.2d 414, 418 (2d Cir. 1983). Substantial evidence is

---

[5]The regulations governing disability determinations for DIB and for SSI are identical. Citations in the remainder of this opinion are to the DIB regulations found in Part 404 of the Social Security regulations. The SSI regulation analogous to the DIB regulation found at 20 C.F.R. § 404.15xx would be at 20 C.F.R. § 416.9xx.

defined as "more than a mere scintilla[:]" it is evidence that a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citation omitted).

2.     The Treating Physician Rule and ALJs' Duty to Develop the Record

The opinion of a treating physician is given controlling weight if it is well supported by medical findings and it is not inconsistent with other substantial evidence. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)(2)). Where the ALJ does not give the treating physician's opinion controlling weight, he is required to provide "good reasons" for this decision. Failure to do so is a ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted). Moreover, an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. Schaal v. Apfel, 134 F/3d 496, 505 (2d Cir. 1998). When a treating physician's opinion "is not adequately supported by clinical findings, the ALJ must attempt, sua sponte, to develop the record further by contacting the treating physician to determine whether the required information is available." Cleveland v. Apfel, 99 F.Supp.2d 374, 380 (S.D.N.Y. 2000) (citing to 20 C.F.R. § 404.1512(e)).

Plaintiff alleges that the ALJ erroneously failed to consider the most current assessment of her mental function by a treating physician. Dr. Bishai-Tewfik wrote on August 13, 2003, that Ms. Fraticelli had a GAF of 50, indicating serious mental symptoms or serious impairment in social or occupational functioning. R. 310. The GAF of 50 on August 13, 2003, was clearly relevant to the consideration of the central question before the ALJ, namely whether Ms. Fraticelli had the mental residual functional capacity to perform her past work or other work.

14

Yet the ALJ ignored Dr. Bishai-Tewfik's indication that plaintiff had a GAF of 50. Because the ALJ failed to give Dr. Bishai-Tewfik's opinion "controlling weight," and failed to provide "good reasons" for this decision, remand is appropriate. If the ALJ considered Dr. Bishai-Tewfik's opinion, concluding that it was not adequately supported by clinical findings, the ALJ had an obligation to develop the record further. Specifically, in light of the other evidence in the record indicating that plaintiff suffered only from mild to moderate depression that would not keep her from working, it was incumbent upon the ALJ to determine whether plaintiff's condition had worsened.

Additionally, the court finds the ALJ's reliance on the GAF of 80 reported by Dr. Lacomba on June 25, 1999, almost two years before Ms. Fraticelli's claim for SSI benefits, troubling. The ALJ stated that Dr. Laconda's assessment was entitled to "considerable weight because it was made by a treating psychiatrist," R. 17, yet failed to accord the opinion of plaintiff's more recent treating physician comparable weight.

Following the ALJ's decision, plaintiff submitted additional evidence to the Appeals Council. Specifically, plaintiff submitted a letter dated March 4, 2004, from her treating physician, Dr. Bishai-Tewfik, stating that plaintiff was not able to work. R. 165. This opinion was consistent with his August 13, 2003 opinion regarding plaintiff's GAF. Where new and material evidence relating to the period on or before the date of the ALJ's decision is submitted to the Appeals Council with the request for review, the Appeals Council must "evaluate the entire record including the new and material evidence submitted . . . [and] review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently in the record." See 20 C.F.R. § 404.970. When the Appeals Council denies review of

15

the ALJ's decision, the new evidence submitted to the Appeals Council becomes part of the administrative record for judicial review. 42 U.S.C. § 405(g); see also Perez v. Chater, 77 F.3d 41 (2d Cir. 1996). The court reviews the entire administrative record, including the new evidence, and determines whether there is substantial evidence to support the Commissioner's decision.

In light of the record as a whole, including Dr. Bishai-Tewfik's March 4, 2004, letter indicating that plaintiff was unable to work due to depression, the case is remanded for further consideration. If, on remand, the ALJ does not give Dr. Bishai-Tewfik's opinion controlling weight, she is directed to provide good reasons for this decision.

Plaintiff also alleges that the ALJ failed to acknowledge or explain her rejection of significant evidence of her physical impairments, most notably her neurological impairment related to diabetes. The ALJ's finding that petitioner was not disabled as a result of her diabetes was supported by substantial evidence. As the ALJ stated, that there had been "no reports from treating physicians which show specific limitations due to physical disorders." R. 17. Plaintiff's initial application for disability benefits made no mention of physical limitations. Dr. Lebovitch, who first diagnosed diabetes in April 2002, R. 196, repeatedly observed that plaintiff did not have any edema of the extremities; he maintained plaintiff on oral medication and recommended a low calorie diet. R. 182, 184, 186, 189, 196, 193, 363. Further, on August 7, 2002, an eye examination revealed no retinopathy. R. 367. Plaintiff relies only on a September 24, 2003 report that she suffered diminished sensation and edema in the lower extremities bilaterally. R. 356. Dr. Lebovitch saw plaintiff on several subsequent occasions, however, and did not note either condition. R. 352, 354, 355. In sum, there was no indication in the record before the

ALJ that plaintiff's diabetes resulted in any significant limitations on her ability to carry out basic work activities.

Nevertheless, since the case must be remanded to the ALJ in any event, the ALJ is also directed to consider Dr. Lebovitch's letter, submitted to the Appeals Council, indicating that, at least as of March 2, 2004, plaintiff was "temporarily unemployable," R. 166, and, if necessary, to further develop the record to determine whether Ms. Fraticelli was under a disability due to her diabetes during the pertinent time period.

## CONCLUSION

For the reasons discussed above, the defendant's motion for judgment on the pleadings is denied and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated: May 18, 2005
Brooklyn, New York

SERVICE LIST:

*Counsel for Plaintiff:*
Ruth Axelrod
Axelrod and Gottlieb
396 Broadway, Suite 902
New York, New York 10013

*Counsel for Defendant:*
Leslie Ramirez-Fisher
Special Assistant U.S. Attorney
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201